cases to be submitted today on oral argument. We'll hear the first two and then take a brief recess before finishing today's docket and we begin with United States v. McCardell. Mr. Larson. May it please the court. As the court no doubt noticed, Tom McCardell is a very unlikely criminal defendant. He's a 65-year-old registered nurse with no juvenile convictions, no adult convictions. He was happily married, is happily married, has three grown children, and had no financial difficulties whatsoever. At least until the indictment in this case was returned. And he was, in fact, on the verge of retiring. And it's hard to imagine a less likely prosecution. The U.S. attorney in the Western District indicted only one person, and that one person was someone who had no prior involvement with Gloria or Vander Himmans. This was someone who had — Why don't you go ahead and move to the issues on appeal, because we're not a jury. I understand. Address the legal issues. What I'm trying to show, Your Honor, is that the evidence in this case is necessarily of a nature that would have raised a reasonable doubt in the mind of a reasonable juror. And that is the point. What is completely missing from this case is any evidence that Tom McCardell had the specific intent required to violate the anti-kickback statute. In fact, the evidence at this trial was such that he took every step that he possibly could to comply with the law. The anti-kickback statute, as this Court has observed on any number of occasions, is a very unusual statute. And everyone — every court that has ever observed this statute knows that it's a very unusual statute. In fact, the — Are you saying he didn't know about the anti-kickback law, or are you just saying he didn't know he was violating it? He didn't know that he was violating the law. And the anti-kickback statute starts out with a requirement that any violation of the statute has to be knowing and willful. And that imposes the specific requirement under the language of this Court for there to be a knowing and willful violation is that you intend to — specifically intend to do that which the law forbids. Didn't the manual explicitly say you cannot ask for or receive referral fees? You cannot pay referral fees, but what is defined as a referral fee is a fee that is in essence in violation of the anti-kickback statute. Why isn't that what we have here, with the mother and the son? Because the — for the — under the anti-kickback statute, to violate the anti-kickback statute, you have to set out to basically circumvent it. It then creates a series of safe harbors, and those safe harbors are very unusual in American law in that what they do is that they immunize you against prosecution for violating the statute. The way it write — it reads is that if you comply with these provisions, that is not a violation of the law. It's not that you even intend to violate the law. It's that that, pure and simple, is not a violation of the law. It creates, as any number of commentators have recognized, complete immunity from prosecution. It's not — We've said it's an affirmative defense, and the jury was instructed on that. But the jury was also given the willfulness instruction that said, instruction 18, they had to find that he acted with bad purpose either to disobey or disregard the law. So they're instructed on that. Does it just come down to a factual sufficiency issue? Well, it comes down to a factual sufficiency issue, and I recognize that the jury instruction issue in this case was not raised in the court below. I did not try the case had I — you know, but that's speculation. But the problem is that we have a jury instruction in this case regarding the affirmative defense that does not take into consideration in any way what happens if you attempt to comply with the safe harbor provision of the anti-kickback statute and you don't make it. In other words, there are seven requirements, and the jury was told the defendant's actions are exempted from criminal liability, and therefore he is not guilty only if the defendant has shown by a preponderance of the evidence that each of the following seven elements are true. In other words, the defendant has to come forward and prove all seven elements to meet the safe harbor. But what happens if you only meet one or two of the requirements? Can a jury at that point find that that creates a reasonable doubt? Absolutely. But it's never told that. It's never told that if you attempt to comply — Wait. You're saying if you only comply with two of the seven aspects of the affirmative defense that you've established the affirmative defense? No. What I'm suggesting is that that can create a reasonable doubt. And the jury has to be instructed that if you attempt to comply with the safe harbor, which, after all, is not just an affirmative defense. It's a complete defense because it provides you with immunity. If you attempt to comply with the safe harbor — What's the difference between an affirmative defense and a complete defense? I mean — When I say complete defense, here they're saying it provides you with — I mean, if you prove self-defense in a shooting, that's a complete defense. I guess I don't understand what distinction you're drawing here. The distinction I'm trying to draw, Your Honor, is that what this statute actually provides is immunity, not just an affirmative defense. If you comply with all seven requirements of a safe harbor, it was Congress's intent to provide you with immunity from prosecution, not to give you a defensive trial, but to say you can't prosecute this man because he's — or this woman because they have complied with the safe harbor. But you didn't move for a pretrial dismissal or anything. I mean, you're saying that he shouldn't have even gone to trial because of this? No. What I'm saying is that ultimately his jury should have been instructed that a showing that attempted compliance with a safe harbor in and of itself can create a reasonable doubt in a criminal case. What the jury here was presented with is essentially an all-or-nothing situation. And that's what they're told. The defendant's actions are exempted from criminal liability, and therefore he is not guilty only — only if he has shown by preponderance of the evidence that each of the following things are true. And so what the jury is told is if he doesn't make all seven, you've got to find him guilty. Well, what case law do you have or what precedent that supports your position that if you comply with two, you win? I do not, Your Honor. And that's part of the problem. This is an unexplored area of this particular intersection between the government's burden of proof at a criminal trial, the safe harbors created by the anti-kickback statute under — by Congress, which were designed — because if you ask yourself, what is the difference between a community marketer or a community educator who works for the corporation, who's out basically trying to generate referrals to a business, to the hospital, and Gloria Hemmons? They didn't — the other ones don't demand a referral fee. But she's paid a flat fee, regardless of the number of — But that's not allowed to be paid under the employee manual. No. She was under the — under the personal services exemption to the anti-kickback statute. And so if — But there were no education services. These other employees were going out in the community saying, here's what our hospital does. There was none of that with the people that he was paying that led to this prosecution, right? I mean, they were just sending patients. They weren't going out in the community and educating people about the hospital. Not that we're — not that's in the record. We have no idea what they were doing, but I'm assuming that — And so the contract which said they were doing that was false. They were not fulfilling the terms of the contract. What they were doing is sending patients, pure and simple. But they weren't doing it on a per-patient basis. They were paid a flat fee, regardless of the number of patients that came. Well, but it's illegal — even if it doesn't be per-patient, as long as the payment is based on an estimate of the number of patients. And there was evidence here that they estimated, what, 12 to 15 a month? Her estimate was that, oh, I can send you 12 to 15 patients a month. But the number actually varied from 9 to 19 over time. And it was as few as 9, and then it was as many as 19. And I understand that this issue was not developed in the court below in terms of the interplay and the intersection between reasonable doubt, affirmative defenses, and what does a defendant have to do under the anti-kickback statute. But what I'm suggesting is that we have a jury here in a case that was filled with indicia of innocence, and yet it receives an instruction that basically says, well, he didn't prove the affirmative defense, find him guilty. And that's why I'm suggesting to the Court as an explanation as to why the reasonable doubt that permeates this case was not recognized in the court below. So the district — so the jury wasn't instructed on the usual standard for reasonable doubt? The jury was instructed on the usual standard for reasonable doubt, but then it gets this jury instruction number 21, which talks about the interplay between reasonable doubt and the affirmative defense. And that's when it's told, well, if he doesn't show all seven elements of the affirmative defense, you can't find him not guilty. And that's the constitutional problem underlying this. And that's why I'm saying it's better to look at the question of reasonable doubt in this case and whether a reasonable juror would have had a reasonable doubt as to Mr. McArdle's defense. And I want — What's the actual claim you want us to throw out the verdict based on? What I — Insufficient evidence. That the evidence was such — the lack of evidence was such regarding Mr. McArdle's intent that a reasonable juror necessarily would have had to have a doubt that he intended to specifically violate the law when he acted as he did in this case. Why couldn't the jury infer intent from his actions? A juror can. They did. But there was nothing to infer the criminal intent, because all of his actions — this is a man who discussed his crime with all of his — A contract that you didn't describe what was actually happening, a contract with a person who wasn't the actual person who was on the other side of the transaction. Why isn't that the suggestion of unlawfulness you say is lacking? I mean, unlawfulness could be inferred from that, but I think it's equally consistent with an innocent motive. I think there's an equally innocent explanation in both of those instances. Let me turn to the sentencing issue in this case, and I know Judge Smith is the author of Landers, which is the key opinion in this case. And what we had here at sentencing is Mr. McArdle was sentenced to 26 months imprisonment. That was a downward variance from the guidelines in this case, 41 to 50 months. Those guidelines were based exclusively on the amount of Medicare billings in this case, and that was over a million dollars. And so there was an increase of 14 levels. The question at sentencing was who has the burden of proof with showing what? And under Application Note 6 to Guideline 2B2.4, it says, well, what you have to use are the net benefits. And as Judge Smith pointed out in Landers, what net benefits means is you take the total amount of the contract or the sums paid, and you deduct the cost of goods sold. If you cannot reasonably compute the net benefits, you use the amount of the bribes paid. Both the district judge and I assumed that the language in Landers put the burden of proof on the defendant to come forward and show that there were costs, in other words, that there were things that had to be deducted from net benefits. As I understand it, correct me if I'm wrong, I just want to understand. So a patient comes in and pays $100, but the hospital incurs $99 in costs to take care of that patient, and the net benefit would only be a dollar, is it? That's correct, Your Honor. And so what we said, well, from this million-dollar figure, you have to deduct the net benefits from that. And what the guidelines tell you, and the Application Note tells you, is that if there's no reasonable method of calculating the net benefits, then you have to use the amount of the bribes. And what I said was, in this particular case, we have showed that there were, in fact, direct costs associated. The owner of PBH, Mr. Logan, testified, and he testified as to all of these direct costs. And then what he said was telling. He said, but we don't keep track of it in that way. We don't basically isolate costs on a per patient basis. That's not how we keep track of our books. And I said to the judge at that point, fine, we can't calculate what the cost of goods were to subtract from the overall benefit, and so we need to use the amount of the bribe. And she said, well, no, you've shown that there were net costs, but you've also shown. Assume you're right that there was a mistake with the loss calculation. What do you do with the fact that the district court gave a substantial downward variance and said even if I was wrong about the loss calculation, this is the sentence I would impose, looking at the holistic sentencing factors? There are two responses to that, Your Honor. The first is that the judge could not impose this sentence if I'm correct about the guidelines, because the sentencing range is 10 to 16 months, and this would be an upward departure. And so she would have had to upwardly depart, and there's no basis in the record for an upward departure in this case. The second thing is this court has said repeatedly that a judge's statement about what he or she would have done were the guidelines to come out differently is not to be considered in terms of a remand. And I can provide the court with — I can't recall the name of those decisions right off the hat, but I'll provide the court with those in a supplemental brief that the court is not to consider that type of statement in determining whether it should be. There's tons of cases where we've considered it and said it's harmless. It has to meet certain clarity, but there are tons of cases. You said you weren't trial counsel, but then you said you were arguing at the sentencing hearing? That's correct, Your Honor. I was brought in after conviction but prior to sentencing. All right. Thank you, Mr. Larson. You saved your full time for rebuttal. Ms. Griffin. May it please the Court, counsel. Your Honors, I will start with the sentence and urge the court to do as Justice Custis suggested and find that if the district court incorrectly counted the sentence, recalculated the guideline range, that any error was harmless. The district court said on the record at the sentencing specifically that if she was wrong— if, in fact, Mr. Larson is successful in arguing on appeal, that he should not have had the burden to prove the direct cause, that that is irrelevant to what the court has done here today and that the court has simply chosen this sentence based on the facts and circumstances that the court has seen in this matter. And this is the court that oversaw the trial, that had the case assigned to it the entire time. It was extremely familiar with the case, and after judging all of the facts and circumstances, it felt that the 26-month sentence was appropriate, and of course it is a sentence that the court could have imposed even had the guideline range calculated out lower. It would not have been a departure. It didn't need any special reasons. It was a variance, and it was what she thought was appropriate after considering all of the 3553A factors. So that is absolutely a sentence that the court could have imposed. As far as Landers goes, that is a case where the defense was required to prove up the amount of the loss. That is consistent—the amount of the credit, excuse me— that is consistent with other Fifth Circuit law where the proponent of a reduction or a change in the sentencing guidelines is responsible for proving up that amount. And the error, if there was error in this case and the court relied on Landers, then it was invited by the defense counsel. I know he says in his brief that, no, no, we made all these objections, we said all these things prior to getting to court, but once they got to court and once they were standing at the podium in front of Judge Foote, he said, Landers says the burden is on me, and I'm prepared to carry it forward. So if, in fact, the judge was wrong to require them to prove up the amount of the offset, then that error was invited by the defendant. Was there an objection to the PSR? I know you said there was not one at court. There was an objection to the PSR, yes, ma'am. On that basis? Yes, ma'am. So it's preserved? I would submit that by the time it got to the sentencing hearing, it had been invited and that that objection had been dropped. If he wanted to preserve it, he should have said, Your Honor, I understand that that's what the Court believes. That was a different lawyer, right? No. Mr. Larson was there at sentencing. He came in after the ---- He said he didn't object. But someone said Landers applied. I thought that was during trial, no? That was at sentencing. Okay. If the Court has no further questions about sentencing, I'll turn to the sufficiency of the evidence. Your Honor, they got the jury instruction they wanted on the safe harbor. The jury was never told. They couldn't consider all of this evidence. Mr. Larson contends that this case was, quote, filled with indicia of innocence, close quotes, what he said just a few minutes ago. He must have been reading a different record than I was. His client didn't testify. There were no other witnesses who testified as to any innocent reason behind the actions he took. Instead, what the jury heard was that he contracted with a woman in Alabama, two states away, to send 12 to 15 patients a month in exchange for $2,500. No community education services. No pens being put out in doctor's offices to remind the doctors, hey, if you have a patient who might benefit from the care our hospital offers, remember to think of us. No people going out and educating the nursing home staff or, as I said, the doctor's office staff or anybody about the services that are provided. Just straight, you send me this money. I'm sorry, you send me these patients and I'll send you this money. How were those payments reflected in the hospital records? I saw no evidence of that in the records, Your Honor. I do not know. But the payments did go to Vander Himmons, and that was at Mrs. Gloria Himmons' request. However, after she made that request, Mr. Larson told her, I'm sorry, Mr. McArdle told her that he needed to have a written contract with Vander Himmons so that the payments going out to him as documented in the hospital records would look legit. And that was the exact word that Mrs. Himmons testified that Mr. McArdle used. If that is an indication that he's trying to hide this and there's fraud, I don't know what is. Additionally, we had, as far as his knowledge and the willfulness of his actions, the employee handbook. We had in evidence the signed receipt where he received the handbook. And then we had additional circumstantial evidence. Two members of the staff, Dr. Tyner and Mr. Gobert, the directors of social services and nursing, became concerned because Mrs. Himmons' patients all seemed, or at least a significant number of them, seemed to them to be faking their symptoms. And they were afraid that these patients were falsifying their condition in order to collect on a pay-per-day hospital policy. They went and presented that to Mr. McArdle. They testified they did that multiple times, and Mr. McArdle blew them off. He did not care. They also, Mrs. Dr. Tyner and Mr. Gobert, testified that whenever they had concerns about the staffing, I'm sorry, the census, the hospital census, and that they needed more patients, they would talk about that to Mr. McArdle, and his response was always just, call Gloria, get her to send us more people. The instruction on the affirmative defense isn't accurate, though, right, because it, and I think their complaint about it is it says if he can't prove the affirmative defense, basically it suggests he has to prove the affirmative defense to be found not guilty, when there could be no affirmative defense, but the government, of course, still has the burden, right? So isn't that confusing to the jury? Well, the jury was also told they had to find the elements of the offense beyond a reasonable doubt, and they, as I said, they weren't told that they couldn't consider those things in mitigation or to decide that he did not have the requisite intent. If they heard any evidence of it, I submit this record there's no evidence or little evidence that he was trying to comply with any safe harbor. I think the judge was very generous in giving the instruction based on the record. As far as the safe harbor, trying to comply with it, he wasn't, the contract was between the hospital and Vander Himmens. Vander Himmens provided no services. Gloria Himmens did. And although the safe harbor provision doesn't explicitly say the contract has to be with the right person, it says that the contract has to be in writing between the parties, and Mr. Himmens wasn't even a party to the agreement. It was with his mother. The safe harbor provision also requires that it accurately explain the services being provided. In this case, it didn't. There were no community education services provided by either of the Himmens, and it also requires that payment not be based on a volume of referrals, and it was. So I would also point out the inconsistency of, well, never mind, I'm sorry. This went on for a long time, didn't it? $2,500 a month for that 40,000, I'm sorry, 40,000, 42,500, I think, maybe a little over, I want to say 16 or 18 months, something like that, before she was indicted for doing the same thing in Florida. Your Honors, I have nothing further. Unless the Court has something for me, I would tender my time back. All right. Thank you, Ms. Griffin. Thank you, Mr. Larson. You've saved time for both. To address something that the government mentioned about why the contract was in Vander Himmens' name, if the Court would refer to the record at page 691, Gloria Himmens was the one who requested that it be put in Vander Himmens' name because she said it would represent a conflict of interest for her since she was employed full-time by Hollywood Pavilion. Mr. McArdle simply accepted that statement. And that was precisely what Gloria Himmens and Vander Himmens had done at Stonewall. We have to remember that what we're talking about probably didn't consume more than 10 to 15 minutes of everybody's time. They had one very brief meeting there with the staff. Do you know Gloria Himmens? Yeah, I do. She used to send us patients over at Stonewall. Is she good? Yeah. Well, can she refer patients? Well, we can hire her as a community marketer like we already have two of here. Only ours are full-time employees. She'll just be a contract employee. It wasn't one of those let's sit down and figure out how to avoid the anti-kickback statute. That's not what occurred in this case. To respond to your question, Judge Costa, regarding the 26-month sentence and the judge's statement, the Supreme Court in Molina-Martinez addressing a decision out of this court said, quote, when a defendant is sentenced under an incorrect guidelines range, whether or not the defendant's ultimate sentence falls within the correct range, the error itself can and most often will be sufficient to show a reasonable probability of a different outcome absent the error. And that court reversed this court's third, the third prong of the. That wasn't a case where the court alternatively said, even if I'm wrong about the guidelines, I've looked at all the factors, and this is the reasonable sentence. But in this case, that would require an upward departure. And there's no. Variance, I think. Well, actually, here it would have to be a departure because it would be outside the guidelines range. Well, I don't want to get into that. A variance is when it's not under the guidelines. It's just as a matter of Booker discretion. And so what I would suggest is going back to the sentencing issue. I didn't invite the error. I was simply the court and I read Landers precisely the same way. If following the law of this court is inviting error, then I don't know what to do. What happened in that was we thought, okay, I have the burden of showing that there are direct costs. I showed that there were direct costs. I then took it the next step and I showed, but we can't determine the amount of those direct costs because that's not how PBH kept its books and records. And so when you can't determine the amount of the direct costs, Landers tells us and Application Note 6 tells us, then you use the amount of the bribes. That alternative prong exists in Application Note 6 for a reason. It exists for precisely situations like this. A defendant at sentencing doesn't have, has but one right. You can issue subpoenas to have people come in. I didn't have unfettered access to the books and records of PBH to try to do a cost estimate. An indigent defendant isn't going to have the ability to subpoena books and records and then hire a forensic accountant to try to determine a per cost, per patient cost basis for determining what the net benefits were. So there was nothing in the hospital record as to any of these patients as to a direct cost, such as the cost of medication or disposable equipment or other things like that? There were no, nothing shown on their account or their bill? Mr. William Logan testified, we don't keep our records on that basis. We don't do it on a per patient basis. We do it on a total cost basis for all of the patients. I mean, that's surprising. I mean, it's up to you to tell us what's in the record, but I can understand allocating utilities and maintenance and those sorts of things, but I don't understand why there wouldn't have been any kind of direct cost per patient for some discrete items. How do they draft their bills? They're very good at drafting bills. They just bill, apparently. They bill patients, they have a per day charge, and then they have medications charges, I guess, that are attributable to a specific patient. But all of the other costs, like overhead, beds, staff, employees, things like that, it's not done on a per patient basis. And that's Mr. Logan's testimony. It's in the record. Just one more question. What do you say the correct guideline range is? Correct guideline range, if we use the figure of $40,000, which is actually what exhibit number 41 for the government shows that the, I believe it's 41, shows that the amount of the bribes paid were, that gives you a guidelines, total guidelines of 12. You increase 8 by 8, plus the base, I'm sorry, you increase by 4 plus the base defense level of 8, that gives you a guidelines range of 12. 12 produces a range of 10 to 16 months. A total offense level of 12 is 10 to 16 months, and we believe that that's the correct guidelines range in this case. All right. Thank you, Mr. Larson. Your case is under submission. Next case for today, Janneking Franchising, Incorporated v. Janneking GB, Ltd.